UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Brokerage Insurance Partners, Inc.<br><br>     Plaintiff,<br><br>v.<br><br>Fidelity & Guaranty Life Insurance Company,<br>Fidelity & Guaranty Life,<br>FS Holdco II Ltd, and<br>John Doe<br><br>     Defendants. | Civil Action No. 17-cv-1815<br><br>CLASS ACTION COMPLAINT<br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiff Brokerage Insurance Partners, Inc. for itself and on behalf of all Class members, by and through its attorneys Davis Agnor Rapaport and Skalny, amends its Original Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) and states the following:

## PARTIES

1.      Brokerage Insurance Partners, Inc. ("BIP") is a Florida Corporation with its principal place of business in Boca Raton, Florida.

2.      Fidelity & Guaranty Life Insurance Company ("F&GLIC") is a Maryland corporation organized under the laws of Maryland and with a principal place of business in Baltimore, Maryland.

3.      Upon information and belief, Fidelity & Guaranty Life is an insurance holding corporation organized under the laws of the State of Delaware ("F&GL") and is a parent corporation or other related corporate entity of F&GLIC.  F&GLIC and F&GL are referred to collectively as "Fidelity."

4.      Upon information and belief, FS Holdco II Ltd. is a corporation organized under the laws of the State of Delaware and is or was a parent corporation of F&GL and/or F&GLIC ("FS Holdco").

5.      Upon information and belief, Defendant FS Holdco, among other things, provides or provided life insurance and reinsurance through F&GL and its wholly-owned insurance subsidiaries, F&GLIC and Fidelity & Guaranty Life Insurance Company of New York, which together are licensed in all fifty states and the District of Columbia.  In this role, upon information and belief, FS Holdco conducts or conducted its business through Fidelity, Fidelity acts or acted as FS Holdco's agent, and FS Holdco exercises or exercised considerable control over Fidelity's day to day operations.

6.      Upon information and belief, John Doe is a seller's agent or advisor who advised Fidelity in its efforts to find a buyer.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over BIP's claims under 28 U.S.C. §§ 1332 and 1367 because the value of the matter in controversy exceeds $75,000 and the controversy is between parties with diverse citizenship.  This Court also has subject matter jurisdiction over BIP's claims under 28 U.S.C. §§ 1331 and 1367 because the claims arise under the Constitution, laws, or treaties of the United States or are related to those federal claims.

8.      Venue is proper under 28 U.S.C. § 1391(b) because the contracts at issue were made and entered into in the State of Maryland and include a venue provision specifying the courts of the State of Maryland or this District Court.

## SUMMARY OF THE ACTION

9.      At least as early as January 2015, BIP entered into a contractual relationship with Fidelity as a general agent[1] (the "Agency Agreement").  Under that agreement, BIP and Fidelity agreed that BIP would be authorized to sell, and enable individual agents to sell, Fidelity's life insurance products.

10.      BIP has entered into agreements with individual agents who contract with and are appointed by Fidelity to sell Fidelity's life insurance products.  To accomplish that goal, these individual agents have also entered into Individual Agent Agreements with Fidelity.  Fidelity is not a party to the agreements BIP has with its individual agents and sub-agencies.

11.      The Individual Agent Agreement between individual agents and Fidelity states that Agents are paid according to a Compensation Schedule.  The Compensation Schedule establishes the percentage premium to be paid to the individual agent on an annual basis.

12.      The Compensation Schedules for the years 2015 and 2016 provided for extraordinarily high commission payments payable to Fidelity's appointed agents and contracted agencies that were designed to promote the writing of life insurance policies.

13.      The Compensation Schedule also states that "Any policies in force at the time this Compensation Schedule becomes effective shall be subject to the commission and commission chargeback provisions set forth in the Compensation Schedule applicable at the time such policies were issued."

14.      Section 23 of the Agency Agreement states that "[BIP] may not change or amend any term of this Agreement without [Fidelity's] written approval. [Fidelity] may amend or change any term of this Agreement, at any time, upon written notice to you, via e-mail or otherwise or by

---

[1]      In the life insurance industry, a general agent acts as an intermediary between life insurance companies, such as Fidelity, and individual insurance agents, who sell life insurance to individuals and companies.

publication on SalesLink. [Fidelity] may also amend or change any Company guideline or policy, whether or not such guideline or policy is referenced in this Agreement. Any such amendment or change shall be effective upon written notice to you via e-mail or otherwise or by publication on SalesLink."

15.     Nothing in either the Agency Agreement or the Individual Agent Agreement allows Fidelity to change any Clawback Term or Compensation Schedule contained therein retroactively for policies in force.

16.     On information and belief, Fidelity uses an automated system whereby its contracts with general agents and individual agents are automatically generated such that its contracts with both general agents and individual agents are substantially identical except for the names of the parties.

17.     According to Fidelity's website, BIP is one of approximately 25,000 licensed agents under contract with Fidelity.  Because each of these agents most likely has a contract substantially identical to BIP, each agent is similarly situated and is therefore a putative class member.



18.     BIP and its Individual Agents sell Fidelity's life insurance products under their respective agreements.  Those life insurance products provide for either monthly, quarterly, semi-

annual or annual premium payments, as determined by the insured.  Insurance policies issued that provide for annual payments cannot lapse within the first year of issue.

19.     Pursuant to the Individual Agent Agreements, when individual agents associated with BIP sold life insurance, Fidelity would pay compensation to the individual agent based upon the then effective Compensation Schedule.

20.     BIP was paid an override commission and bonus compensation based on the premium volume generated by individual agents in its geographic region.

21.     If a life insurance policy lapsed[2] prior to the end of its first year of issue, the Individual Agent Agreement required the individual agent to return any compensation paid to it by Fidelity for that lapsed policy (the "Clawback Term").  For example, under the Agreement, if an individual bought a life insurance policy on January 1, 2015 and made all required payments until after January 1, 2016, the general agent and individual agent would keep all compensation paid by Fidelity.  In contrast, if the same policy was purchased on January 1, 2015, but the individual stopped making payments before January 1, 2016, the general agent and individual agent were required to return any compensation paid by Fidelity.

22.     BIP's Agency Agreement requires BIP to indemnify Fidelity for, among other things, any clawback payments not returned to Fidelity by the Individual Agent as well as all override and bonus compensation received by BIP from Fidelity in connection with any lapsed policy.

23.     In reliance on their respective agreements, BIP and other similarly situated general agents and individual agents conducted their businesses to sell hundreds of millions of dollars in life insurance products for Fidelity.

---

[2]     A policy is considered to have lapsed if the policy holder does not make required payments within the agreed upon time period.

24.     On or around the beginning of 2017, Fidelity announced to BIP and to other similarly situated general agents and individual agents that it was unilaterally and retroactively changing the Individual Agent Agreements to increase the Clawback Term to two years from one year.

25.     As a result of Fidelity's retroactive change to the Clawback Term, Fidelity[3] sent letters requiring BIP, its individual agents, its sub-agencies, and their respective individual agents to return compensation paid to them that was related to life insurance policies that had lapsed after the original one-year Clawback Term but before the new two-year Clawback Term (the "Demand Letters").

26.     The Demand Letters sent to Individual Agents required the agents to return all compensation paid on lapsed policies.  The Demand Letters to Agencies required return of all portions of overrides and other compensation paid on now-lapsed policies and for the Agency to indemnify Fidelity for any commission not returned by the Agency's Individual Agents.  For example, one Demand Letter stated:  "This letter will serve as our request for full repayment of your debit balance in the amount of ($93,660.27). Your payment must be in our office no later than 04/28/2017."  A true and correct copy of two exemplar Demand Letters are attached hereto as Exhibit 1.

27.     Fidelity's attempted retroactive change to the Individual Agent's Agreement and consequent Demand Letters have caused significant monetary, reputational, and relational harm to BIP and other similarly situated general agents and individual agents.  Fidelity's actions have

---

[3]     It is unclear whether F&GLIC or F&GL sent the letters as they are on F&GL's letterhead but signed by F&GLIC.  Further confusing the issue is the fact that every page of the letter contains a footer stating:  "Fidelity & Guaranty Life is the marketing name of Fidelity & Guaranty Life Insurance Company issuing insurance in the United States outside of New York."

harmed the businesses and contractual relationships between BIP and its individual agents, and

upon information and belief have caused similar harm to other Class members.

28.     In its Demand Letters to BIP and its related agents, Fidelity has threatened, among

other things, to place BIP and its individual agents on the "vector list."  For example, one Demand

Letter stated:

> In the event your payment is not received within the requested time frame your
> agent account will be terminated, vectored and forwarded to our external
> collection agency.  Details are listed below.  In addition, you risk an increase in
> costs due to collection efforts which may exceed 25% or more of the principal
> balance.

*See* Exhibit 1.  That same Demand Letter also specifically stated:

> Please be aware that Fidelity and Guaranty Life is a subscriber to Vector One.
> As such, we are required to submit to Vector, information about any unpaid
> agent's account balances.  This information is then made available to other
> companies that subscribe to the Vector Service.

*See* Exhibit 1.  Being placed on the "vector list" serves to blackball an individual agent and

destroy that agent's business as that agent can no longer be appointed with other insurance

companies and sell their products.  Being placed on the "vector list" also adversely affects an

agent's credit report.

29.     Upon information and belief, Fidelity has sent nearly identical letters containing

nearly identical threats to other members of the Class.

30.     After the Original Complaint was filed, Fidelity[4] began to send letters purporting

to determine whether insured parties planned to pay the next required premium to avoid the

---

[4]     It is unclear whether F&GLIC or F&GL sent the letters as they are on F&GL's letterhead but signed by
F&GLIC.  Further confusing the issue is the fact that every page of the letter contains a footer stating:  "Fidelity &
Guaranty Life is the marketing name of Fidelity & Guaranty Life Insurance Company issuing insurance in the
United States outside of New York."

policy's lapse.  The letters request that the insured call Fidelity's agent before a certain date.

Fidelity then sent a second letter — days, weeks, or months before the policy was due to lapse —

"to inform" the insured that Fidelity had "rescinded the life insurance policy identified above,

effective immediately."  To support that rescission, the letter stated:  "Given that the company did

not receive any response to its letter and given the unusual nature of a policy of this size lapsing

so early, the company is rescinding the policy."   A true and correct copy of one exemplar

Rescission Letter is attached hereto as Exhibit 2.  The insureds have purportedly received or will

receive the return of all premiums paid.  Such rescissions are a blight on the insureds' personal

records and make it more difficult or impossible for them to obtain replacement life insurance.

Fidelity's Rescission Letters are damaging to BIP and its agents because Fidelity is accusing BIP

and its agents of illegal behavior.  These statements are false.

       31.    Upon information and belief, Defendants' decision to rescind polices is primarily

an unlawful retaliation against BIP for filing this lawsuit.  Rescission of these policies has caused

monetary and reputational harm to BIP, its agents, and those similarly situated because the

individual insureds have taken their life insurance business to other agents and other life insurance

providers and agents have taken their business to other general agencies as a result of Defendants'

actions.  BIP, its agents, and those similarly situated have also been harmed because under the

Agency Agreement Fidelity has claimed that BIP is obligated to return all commissions paid on

the rescinded policies.

       32.    Defendants' rescission of these life insurance policies is unlawful and against

public policy.

       33.    Fidelity's threats, Demand Letters, and purported Rescission Letters have

interfered with BIP's business relationships with its individual agents.

34.     Upon information and belief, Fidelity's grossly excessive compensation pricing, unilateral retroactive change to its contractual clawback provision, and attempts to charge back its individual agents and agencies have been motivated by FS Holdco's desire to artificially inflate the value of Fidelity in the eyes of a potential buyer at the cost of Fidelity's general agents and individual agents.

35.     Fidelity's grossly excessive compensation pricing schedule had the desired effect of promoting the sale of Fidelity's life insurance products by BIP's agents, as said agents sold Fidelity's life insurance policies which provided for target premium payments in excess of $27,035,164 from 2015 through 2017.

36.     Upon information and belief, Fidelity's grossly excessive compensation pricing schedule had the desired effect of promoting the sale of Fidelity's life insurance products by other general agents and their respective individual agents.

37.     Upon information and belief, FS Holdco and Fidelity are now or have been intentionally seeking to artificially increase Fidelity's value in the eyes of a potential buyer by wrongfully recapturing commissions and extracting money and value from its agents.

38.     On or about May 24, 2017, Fidelity announced its sale for approximately $1.835 billion.

39.     Upon information and belief, Fidelity has justified the chargebacks to its agencies and individual agents by asserting that the terms of its Agency Agreement and Individual Agent Agreement give Fidelity the right to unilaterally and retroactively change the terms of those agreements relative to their respective Compensation Schedules and related provisions.

## CLASS ALLEGATIONS

40.     **Class Definition**:  Plaintiff BIP brings this action pursuant to Federal Rule of Civil

Procedure 23(b)(1) and (3) on behalf of itself and a Class of similarly situated general agents and

individual agents, defined as follows:

> **Class**: All persons or entities that have entered into an Agreement with Fidelity
> to sell life insurance and have sold at least one life insurance policy between
> January 1, 2015 and January 1, 2017.

41.     **Numerosity**:  The exact number of the members of the Class is unknown and not

available to Plaintiff at this time, but it is clear that individual joinder is impracticable.  As alleged

above, Defendant's website indicates that it has 25,000 licensed agents.  It is unknown whether

this number is up to date, or whether it includes all individual agents as well as general agencies

and sub-agencies.

42.     **Commonality and Predominance**:  Many questions of law and fact are common

to Plaintiff's and the Class's claims, and those questions predominate over any questions that may

affect any individual member of the class.  Common questions for the class include, but are not

limited to:

a.   Did Fidelity repudiate the class members' agreements when it changed the
duration of the Clawback Term?
b.   Does Fidelity's Demand Letter constitute a breach of the class members'
Agreements?
c.   Does Fidelity's Demand Letter tortiously interfere with the class members'
contractual and business relationships?
d.   Was Fidelity unjustly enriched by first agreeing to a one-year Clawback Term and
then changing that Clawback Term to two years?

43.     **Typicality**:  Plaintiff's claims are typical of the claims of the members of the Class

as all members of the Class are similarly affected by Fidelity's wrongful conduct in violation of

the federal laws complained of herein.

44.    **Adequate Representation**:  Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

45.    **Superiority**:  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some individual Class members may be relatively small, the expense and burden of individual litigation would make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

46.    Plaintiff reserves the right to revise the "Class Allegations" and "Class Definitions" based on facts learned through additional investigation and discovery

**COUNT I:  BREACH OF CONTRACT**
**(as to F&GLIC and F&GL)**

47.    Plaintiff, BIP, incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

48.    The aforementioned Agency Agreement established a contractual relationship between the Fidelity and the Plaintiff.

49.    Plaintiff has duly performed under the Agency Agreement.

50.    On or about January 1, 2017, Fidelity repudiated the Agency and Independent Agent Agreements and those of other Class members when it unilaterally changed the terms of said Agreements.

51.     Fidelity breached the Agency Agreement when it demanded repayment of more than $200,000 in commissions paid to Plaintiff with respect to life insurance policies that had lapsed after more than one year.

52.     Fidelity has withheld commission payments owed to BIP, other agencies, and Fidelity's Individual Agents, allegedly as an offset against sums that Fidelity claims are owed by BIP, other agencies, and other individual agents.

53.     The Plaintiff has suffered actual damages as a result of Fidelity's breaches.

54.     Under the respective agreement, Plaintiff is entitled to all of the Attorney's Fees and Costs associated with its successful prosecution of this claim.

55.     Upon information and belief, the allegations herein are common among all Class members.

## COUNT II:  TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (as to F&GLIC, F&GL, and FS Holdco II)

56.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

57.     BIP has contractual relationships similar to those at issue here with other life insurance providers.

58.     Similarly to their business with Fidelity, BIP conducts its businesses pursuant to those contracts and sell hundreds of millions of dollars in life insurance products for other life insurance providers.

59.     When BIP is "vectored," as Fidelity states that it has done or will do in its Demand Letters, BIP's contractual relationships with other life insurance providers are or will be directly damaged.

60.     Upon information and belief, FS Holdco conspired with F&GLIC and F&GL to increase the value of FS Holdco's subsidiaries unlawfully.  Upon information and belief, FS Holdco instructed Fidelity, in its capacity as principal, to take any and all steps necessary to increase Fidelity's value.  Upon information and belief, FS Holdco instructed Fidelity to, knew Fidelity did, or should have known Fidelity did, *inter alia*, demand repayment from BIP, threaten vectoring and civil lawsuits, improperly rescind insurance policies, and take other unlawful acts that have tortiously interfered with the BIP's third-party contractual relations.

61.     As a result of the Defendant's conduct, BIP has suffered and will continue to suffer lost profits and other consequential damages.

62.     Upon information and belief, the allegations herein are common among all Class members.

## COUNT III:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS (as to F&GLIC, F&GL, and FS Holdco II)

63.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

64.     BIP has business relationships with Individual Agents and sub-agencies.

65.     Fidelity knew that BIP was selling life insurance products and intended to continue to sell life insurance policies pursuant to the aforementioned agreement.  Fidelity knew that BIP sold life insurance products through Individual Agents and sub-agencies.

66.     When Fidelity unilaterally and retroactively changed the Clawback Term, it damaged BIP's current and prospective business relations.  By purportedly rescinding life insurance policies unlawfully, Defendants have retaliated against BIP and damaged BIP's current and prospective business relations with its agents, sub-agencies, and insurance clients.

67.     Without legal justification, Fidelity intentionally and improperly interfered with Plaintiff's business relationships and prospective agreements.

68.     Fidelity knew that changing the Clawback Term and rescinding life insurance policies would harm BIP's current and prospective business relationships.

69.     Fidelity's actions were done with an improper motive.

70.     Upon information and belief, FS Holdco conspired with F&GLIC and F&GL to increase the value of FS Holdco's subsidiaries unlawfully.   Upon information and belief, FS Holdco instructed Fidelity, in its capacity as principal, to take any and all steps necessary to increase Fidelity's value.   Upon information and belief, FS Holdco instructed Fidelity to, knew Fidelity did, or should have known Fidelity did, *inter alia*, demand repayment from BIP, threaten vectoring and civil lawsuits, improperly rescind insurance policies, and take other unlawful acts that have tortiously interfered with the BIP's third-party business relations.

71.     As a result of the Defendant's conduct, the Plaintiff has suffered and will continue to suffer lost profits and other consequential damages.

72.     Upon information and belief, the allegations herein are common among all Class members.

## COUNT IV:  DETRIMENTAL RELIANCE
### (alternatively to COUNT I as to F&GLIC and F&GL)

73.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

74.     Fidelity made a clear and definite promise to BIP in the Agency Agreement.

75.     Fidelity reasonably expected its promise would induce BIP to engage Individual Agents and sub-agencies to sell life insurance products.

76.     Fidelity's promises found in the Agency Agreement and Individual Agent Agreement induced actual and reasonable action by BIP to enter into business relationships with Individual Agents and sub-agencies so that they would sell life insurance products.

77.     The resulting detriment to BIP can only be avoided by the enforcement of the original agreement.

78.     Upon information and belief, the allegations herein are common among all Class members.

### COUNT V: NEGLIGENT MISREPRESENTATION
### (alternatively to COUNT I as to F&GLIC and F&GL)

79.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

80.     Pursuant to the above outlined relationship, Fidelity had a duty of care and of good faith and fair dealing to BIP.  These duties required the transmittal of accurate information to BIP.

81.     The statements made by Fidelity to convince BIP and others to sign the Agreements, especially those regarding the Clawback Term and that those terms would remain the same for issued policies, were false.

82.     These false representations were repeated on multiple occasions.

83.     Fidelity was negligent in the assertion of these false statements.

84.     The statements made by Fidelity to BIP were made with the intention of having BIP act and rely upon Fidelity's negligent assertions.

85.     Fidelity knew that BIP would probably rely upon and was, in fact, relying upon Fidelity's negligent statements to sell life insurance products.

86.     Fidelity knew that by retroactively changing the terms of the Individual Agent Agreement, BIP would incur damage.

87.     As a result of the conduct of negligent misrepresentations by Fidelity, BIP incurred damages.

88.     Upon information and belief, the allegations herein are common among all Class members.

## COUNT VI:  FRAUDULENT INDUCEMENT
### (as to F&GLIC and F&GL)

89.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

90.     Fidelity made false representations to the Plaintiff regarding the Clawback Term, when it entered into the Agreement.

91.     Fidelity knew at the time that it made the representations that it intended to change that provision or that it was a possibility in the near future, but made the representation that the Clawback Term contained in the Agreement was accurate.

92.     The representations were made for the purpose of causing the Plaintiff to enter into the Agreement.

93.     The Plaintiff and its agents reasonably relied on that representation when they proceeded to enter into life insurance sales agreements with customers.

94.     The Plaintiff has suffered and will continue to suffer compensable injury resulting from the misrepresentation.

95.     Upon information and belief, the allegations herein are common among all Class members.

## COUNT VII:  UNJUST ENRICHMENT
### (alternatively to COUNT I as to F&GLIC, F&GL, and FS Holdco II)

96.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

97.     Plaintiff and the Class have conferred a benefit upon Defendants in the form of premiums paid on life insurance policies between the first and second year of the particular policy.

98.     Plaintiff and the Class would have sold Defendants' policies with different economic terms if the Clawback Term had been two years instead of one.  As a result, Defendants would not have received the benefit of certain policies.

99.     Defendants appreciate and have knowledge of the benefits they received.

100.    Defendants should not be permitted to retain the ill-gotten gains as a result of the wrongful conduct described herein.

101.    Upon information and belief, the allegations herein are common among all Class members.

**COUNT VIII:  DEFAMATION**
**(as to F&GLIC and F&GL)**

102.    Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

103.    By reporting BIP to Vector, Fidelity knowingly made false statements in writing or orally about BIP.  By sending the purported Rescission Letters starting around August 2017, Fidelity knowingly made false statements in writing or orally about BIP to other agents, sub-agencies, and insured individuals.

104.    Alternatively, by reporting BIP to Vector, Fidelity negligently made false statements in writing or orally about BIP and by sending the purported Rescission Letters, Fidelity negligently made false statements in writing or orally about BIP to other agents, sub-agencies, and insured individuals.

105.    These statements were reasonably understood to be defamatory by Vector, Fidelity, BIP, the other agents and sub-agencies, and the insured individuals.

106.    Fidelity knew or should have known its statements were false when they were made.

107.    Fidelity made its statements with the intent to harm BIP.

108.    BIP suffered a loss as a result of being reported to Vector by Fidelity.  BIP suffered a loss as a result of the false statements made because those agents, agencies, and individuals have taken their business to other general agents instead of BIP.

109.    Upon information and belief, the allegations herein are common among all Class members.

<u>**COUNT IX:  VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT ("RICO")**</u>
<u>**(as to F&GLIC, F&GL, FS Holdco II, and John Doe)**</u>

110.    Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

111.    F&GLIC, F&GL, FS Holdco, and John Doe ("RICO Defendants") have engaged in an enterprise whose activities affect interstate commerce.

112.    The RICO Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of extorting and defrauding Plaintiff.

113.    Pursuant to and in furtherance of their scheme, the RICO Defendants committed multiple related acts of extortion, retaliation, and fraud, including, but not limited to:

   a)    Sending Demand Letters through the U.S. Postal system designed to extort money from Plaintiff by threat;
   b)    Attempting to defraud Plaintiff to obtain money by means of false or fraudulent pretenses, representations, or promises;
   c)    Threatening Plaintiff with further financial damage by adding Plaintiff to the Vector list, when the RICO Defendants knew such a report would be fraudulent;

d)      Sending unlawful and retaliatory Rescission Letters through U.S. Postal
system designed to harm Plaintiff and obtain money which it was not owed.

114.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18
U.S.C. § 1961(5).

115.    As a direct and proximate result of the RICO Defendants' racketeering activities
and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property.

116.    Upon information and belief, the allegations herein are common among all Class
members.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and all Class members, respectfully requests
the following relief:

(a)      Actual damages in an amount to be determined at trial;

(b)      Declaratory Judgment stating that the Clawback Term cannot be changed
retroactively and therefore that all life insurance policies sold before January 2017 are
subject to a one-year Clawback Term;

(c)      Alternatively, Declaratory Judgment stating that the Individual Agent Agreement
and Agency Agreement are illusory and unenforceable to the extent that they allow Fidelity
to unilaterally and retroactively change material terms.

(d)      Declaratory Judgment stating that any insurance policies improperly rescinded by
Fidelity shall be reinstated with a reasonable opportunity for the insureds to pay any
premiums due.

(e)      Injunctive relief to protect the interests of Plaintiff and the Class;

(f)      Compensatory, consequential, and punitive damages in an amount to be
determined at trial;

19

(g)     Full disgorgement and restitution of any money Defendant has retained as a result

of its wrongful actions;

(h)     Treble damages pursuant to 18 U.S.C. § 1964(c);

(i)     Pre- and post-judgment interest;

(j)     All attorney's fees and costs associated with bringing this action;

(k)     Grant any reasonable request to amend Plaintiff's Complaint to conform to the

discovery and evidence obtained in this action; and

(l)     Such other and further relief as the Court deems just and proper.

Respectfully submitted,

        /s/
Angela Grau, Esq.
Gregory L. Ewing, Esq.
Davis, Agnor, Rapaport & Skalny
10211 Wincopin Circle, Suite 600
Columbia, MD  21044
(410) 995-5800